DELAWARE, LACKAWANNA AND WESTERN COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33813. Promulgated October 24, 1932.

*J. Marvin Haynes, Esq.,* and *Walter A. Staub, C. P. A.,* for the petitioner.
*O. J. Tall, Esq.,* for the respondent.

#### OPINION.

MURDOCK: The Commissioner determined a deficiency in income and profits taxes for the calendar year 1921 in the amount of $753.80. Several issues raised by the petition have been settled by a stipulation of the parties, leaving for our determination but one issue

which is that the Commissioner has erred in rejecting the petitioner's application to have its profits tax computed under section 328 of the Revenue Act of 1921.

The petitioner is a New Jersey corporation, with its principal office in New York City.

For almost sixty years prior to 1909 the Delaware, Lackawanna and Western Railroad Company had engaged extensively in mining, purchasing, transporting and selling anthracite coal. In May, 1909, the Supreme Court of the United States decided that these activities were in violation of the Hepburn Act. *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 213 U. S. 366. The railroad company, after considering various methods calculated to comply with the law and yet to save its valuable coal business for its stockholders, finally decided to organize the petitioner. The petitioner was organized in June, 1909, with an authorized capital stock of $6,800,000, divided into 136,000 shares of the par value of $50 each. The petitioner was to purchase the coal of the railroad company just prior to shipment, and to ship and sell it as the railroad company had done formerly. Stockholders of the railroad company were advised of the situation and were permitted to subscribe for the petitioner's stock on the basis of one share to each share of railroad stock held. In order to enable the stockholders to purchase their allotted shares, the railroad company declared a 50 per cent dividend and suggested that each stockholder authorize the treasurer of the railroad company to use one-half of the dividend to pay for the number of shares in the petitioner to which such stockholder was entitled to subscribe. Practically all of the stockholders of the railroad company followed the plan suggested so that the stockholders of the two corporations were identical for the most part. The petitioner began business immediately, with personnel taken over from the railroad company with the business. A contract was entered into by the railroad company and the petitioner on August 2, 1909, whereby the petitioner purchased coal on hand, leased certain equipment, and agreed to take over existing sales contracts and to conduct the business so as best to conserve the good will and markets of the railroad company. The agreement was to continue until either party gave notice of six months. The rental was less than the railroad would have accepted from outsiders. The customers were notified of the change and urged to continue as customers of the new coal company.

The petitioner's gross tonnage, gross sales, and net profits for a representative period after the exchange compared favorably with those of the railroad company from its coal-selling business before the change. Sales of the petitioner's stock in the last six months of 1909 ranged in price from $90 to $130 per share.

**1332**

The validity of this contract was attacked by the Federal Government, and the Supreme Court on June 21, 1915, handed down its decision in *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516, holding the contract illegal and enjoining further transportation of coal under it because the contract retained for the railroad company too great interest in and control over the coal sold and thus violated both the commodity clause of the Hepburn Act and the Anti-Trust Act. In the meantime, on June 5, 1914, the two corporations had entered into a new contract eliminating some of the objectionable features of the old, but. preserving the essentials of the petitioners' business derived from the railroad company. On July 30, 1915, they entered into another contract to further conform to the decision of the Supreme Court. These various changes gave the railroad company less control over the business of the petitioner and gave the latter the right to exercise greater freedom in its dealings with the railroad company and others. The actual business of the petitioner and the profits derived therefrom went on uninterruptedly throughout this period. Old customers were retained through the year here involved. In 1921 all but about 25 per cent of the petitioner's stock was held by stockholders of the railroad company. In 1921 or thereafter the railroad company sold its coal-mining business and the purchaser took over the contract with the petitioner.

The following are condensed balance statements of the petitioner as of January 1 and December 31, 1921:

| | Dec. 31, 1921 | Jan. 1, 1921 |
|---|---|---|
| ASSETS: | | |
| Cash | $2, 409, 943. 18 | $7, 119, 744. 83 |
| Due from agents | 6, 698, 767. 59 | 9, 725, 123. 24 |
| Sundry accounts receivable | 347, 347. 91 | 63, 950. 84 |
| Treasury stock | 17, 950. 00 | 18, 250. 00 |
| Bills receivable | 350, 000. 00 | 350, 000. 00 |
| Coal on hand | 7, 438, 626. 82 | 1, 757, 561. 62 |
| INVESTMENTS: | | |
| 1st Issue Liberty Loan | 1, 890, 160. 00 | 1, 890, 160. 00 |
| Victory Notes | 855, 180. 00 | 855, 180. 00 |
| United Kingdom Great Britain & Ireland Notes | | 214, 730. 00 |
| Securities, Foreign | 75, 693. 60 | 75, 693. 60 |
| Land, Trestles, etc | 894, 883. 73 | 877, 225. 32 |
| Less depreciation | (Red) 260, 070. 64 | (Red) 220, 678. 04 |
| Total | 20, 718, 482. 19 | 22, 726, 941. 41 |
| LIABILITIES: | | |
| Accounts and bills payable | $3, 898, 278. 58 | $7, 262, 820. 21 |
| Accrued rentals | 36, 883. 42 | 12, 253. 42 |
| Reserve for renewals (leased structures) | 59, 100. 79 | 59, 100. 79 |
| Accrued taxes | 1, 321, 535. 29 | 2, 009, 126. 62 |
| Insurance fund | 106, 429. 39 | 109, 116. 28 |
| Dividends due and unpaid | 288, 326. 36 | 288, 270. 11 |
| Capital stock (issued) | 11, 533, 725. 00 | 11, 533, 725. 00 |
| Surplus | 3, 474, 203. 36 | 1, 452, 528. 98 |
| Total | 20, 718, 482. 19 | 22, 726, 941. 41 |

The petitioner, in its return for the calendar year 1921, reported, among other items, the following:

| | |
|---|---:|
| Gross sales less returns and allowances | $82,374,199.31 |
| Gross income | 7,099,821.30 |
| Net income | 4,435,187.78 |
| Invested capital | 14,252,111.26 |
| The Commissioner reduced net income to | 4,158,702.40 |
| increased invested capital to | 14,256,771.92 |
| and determined profits taxes to be | 863,997.74 |

The parties now agree that invested capital should be further increased by $74,675.28.

The petitioner has applied for and the Commissioner has denied it the privilege of having its profits taxes computed as provided in section 328 of the Revenue Act of 1921.

The petitioner came into being under peculiar circumstances. The railroad company had built up, over a long period of years, a very large and profitable coal business, mining, buying, transporting and selling coal from the anthracite fields of eastern Pennsylvania. Its customers were located at various points reached by its rails. It could no longer continue this business under the law. In an effort to comply with the law and, at the same time, to preserve the value of the business to its stockholders, the petitioner was formed and the business turned over to it. Overnight the petitioner was launched in a prosperous business earning far more than a normal return on its tangible assets. The stock of the petitioner immediately sold at double its par value, at which the original stockholders had obtained it. The petitioner paid nothing and gave no stock for the valuable intangible assets of this business. These intangible assets obtained by the petitioner are not reflected in its invested capital. The railroad, instead of transferring the intangibles to its stockholders and allowing them to pay them in for stock or shares, attempted to transfer them directly to the petitioner. The railroad could afford to do this because its stockholders lost nothing through the change and the railroad retained all of the advantages which it thought the law allowed. Although the early contracts were invalid, the petitioner was permitted to enjoy all the benefits of the old business to the same extent it would have enjoyed them had the contracts been valid. The advantages which the petitioner thus acquired and which it retained through its close relation with the railroad were among its most important income-producing factors during the period from its beginning through the year here in question.

There was an abnormality in the petitioner's capital of such magnitude as to entitle it to have its profits taxes computed under

section 328 of the Revenue Act of 1921. Cf. *J. M. & M. S. Browning Co.*, 6 B. T. A. 914; *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Rothschild Colortype Co.*, 14 B. T. A. 718; *Stephens-Adamson Mfg. Co.*, 16 B. T. A. 41; *Gantz Tank Co.*, 16 B. T. A. 212; *Roslyn Fuel Co.*, 16 B. T. A. 285; *Marc Eidlitz & Son, Inc.*, 18 B. T. A 187; *Concrete Engineering Co.*, 19 B. T. A. 212.

Reviewed by the Board.

*Further proceedings will be had under Rule 62 (c).*

———————

BLACK, dissenting: I do not agree that this proceeding presents a proper case for special assessment, especially on the ground on which the majority opinion places it. The concluding part of the majority opinion reads, " There was an abnormality in petitioner's capital of such magnitude as to entitle it to have its profits taxes computed under section 328 of the Revenue Act of 1921." (Citing cases.) As I see it, there was not only no abnormality in petitioner's capital of a large magnitude, but, on the contrary, there was no abnormality at all.

Petitioner was organized in 1909 with a capital stock of $6,800,000, divided into 136,000 shares of the par value of $50 each. All of these shares were subscribed for by stockholders of the Delaware, Lackawanna and Western Railroad Company and the full amount was paid in cash. The Commissioner allowed this invested capital in his computation and I fail to see where petitioner has any ground for complaint.

The majority opinion cites, in support of the conclusion reached, such cases as *J. M. & M. S. Browning Co.*, 6 B. T. A. 914; *Clarence Whitman & Sons Co.*, 11 B. T. A. 1192; *Concrete Engineering Co.*, 19 B. T. A. 212. I do not think these cases are in point. These are cases where the corporation had *acquired* valuable assets and was prevented from including them in invested capital by reason of the prohibitions contained either in section 326(a)(3) or section 331 of the applicable revenue acts.

To illustrate, in *Clarence Whitman & Sons Co., supra*, Clarence Whitman, who had been carrying on a valuable business for many years, covenanted and agreed with the newly organized corporation, Clarence Whitman & Sons, Inc., that it should have the exclusive right to use his name in connection with its business throughout the world and that he would not use or willingly permit the use of his name in connection with a competing business. He also transferred to the newly organized corporation all the good will attaching to his name. On June 3, 1918, in consideration of the said transfer of good will and in consideration of the said agreements,

the corporation, Clarence Whitman & Sons, Inc., issued $1,000,000 par value of its common stock to Clarence Whitman. In that case we held that the trade name and good will which Clarence Whitman transferred to the corporation had a cash value at that time of at least $412,500. That amount was "paid in" to the corporation. But we further held that, on account of the provisions of section 331 of the Revenue Act of 1918, petitioner was not entitled to include these intangibles in invested capital, because they had cost the transferror, Clarence Whitman, nothing.

We further held that this exclusion from invested capital by reason of a prohibition contained in the statute, coupled with the fact that these intangible assets were the principal factor contributing to the production of the income, created an abnormality, which entitled the taxpayer to special assessment.

This sort of a case, as I view it, is no precedent for the majority opinion of the Board in the instant case. In the instant case there has been no "paying in," so far as I have been able to find from the facts stated in the opinion, of intangible assets for capital stock as there was in *Clarence Whitman & Sons, Inc., supra*, or even for a nominal consideration as there was in *J. M. and M. S. Browning Co., supra*, and *Concrete Engineering Co., supra*. There was no "paying in" at all, so far as I have ascertained from the facts, by the Delaware, Lackawanna & Western Railroad Company of any assets, either tangible or intangible, to the newly organized corporation, Delaware, Lackawanna and Western Coal Company. The latter corporation was organized in the regular way and its entire capital stock was subscribed and paid for in cash to the amount of $6,800,000. Thereupon the newly organized corporation made an advantageous contract with the railroad company, but I can not see where that fact creates the slightest abnormality in petitioner's invested capital.

The situation, it seems to me, is very similar to that which we had before us in the recent case of *Western Indiana Gravel Co.*, 25 B. T. A. 654. In that case the Northern Railroad, a part of a system operated by the Cleveland, Cincinnati, Chicago & St. Louis Railroad, owned some valuable gravel pits which it was operating. The railroad was advised by its counsel that it did not have the necessary powers to sell its surplus gravel in the market. Thereupon certain individuals connected with the railroad and some of their associates organized the Western Indiana Gravel Company, with a capital stock of $100,000. Certain advantageous contracts were executed between the railroad and the newly organized corporation, Western Indiana Gravel Company. One hundred thousand dollars of the corporation's capital stock was issued to these individual incorporators in consideration of a purported transfer of these valuable contracts

by them. The corporation sought to include this $100,000 in its invested capital for the taxable year which was before us. We said, " No." The contracts were not " paid in " to the corporation by these stockholders or anybody else. They were not the owners of the contracts. The corporation made the advantageous contracts itself with the railroad without cost; hence, the contracts cost it nothing and therefore did not represent any invested capital, and the corporation was not entitled to include the value of the contracts in its invested capital. In denying special assessment, we said:

It remains to decide whether the exclusion from invested capital of the value of the four contracts in itself creates an abnormality. It is perfectly clear, at the outset, that the mere statutory exclusion of an asset from invested capital does not of itself justify special assessment. *Morris & Co.*, 1 B. T. A. 704; *W. E. Beckmann Bakers' & Confectioners' Supply Co.*, supra; *Sanford Cotton Mills*, 14 B. T. A. 1210; *Enameled Metals Co.*, 14 B. T. A. 1392; *J. D. Williams, Inc.*, 22 B. T. A. 21.

Engrafted on this rule, however, is the exception adopted in *J. M. and M. S. Browning Co.*, 6 B. T. A. 914, where the asset excluded for statutory reasons is a substantial part of its capital and productive of a very substantial part of the taxpayer's income. *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Detroit Opera House*, 13 B. T. A. 587; *Rothschild Colortype Co.*, 14 B. T. A. 718.

But the petitioner can not avail itself of this exception, for in the above cases the asset excluded for statutory reasons was paid in for stock, and while the asset was not part of the invested capital, as defined by the statute, it was nevertheless an unrecognized capital asset largely productive of the petitioner's income, so that its exclusion would result in abnormality. Such is not the case here. The contracts were not paid in for stock, so that the petitioner has not met the first condition of its claim. *Electric Appliance Co.*, 19 B. T. A. 707; *Washington Electric Supply Co.*, 9 B. T. A. 1399.

The facts in *Electric Appliance Co.*, supra, were substantially as follows: The Electric Appliance Company of Chicago, an Illinois corporation, had established a large and profitable business on the Pacific Coast as well as elsewhere. Due to California laws and other considerations, it was determined in 1905 to incorporate the San Francisco branch as a separate corporation, and this was done under the name of the Electric Appliance Company. This latter company succeeded to all the business and good will of the Illinois company in the California territory, without paying anything for it and the Illinois corporation withdrew from that field. The stock of the California corporation was not taken by the Illinois corporation, but most of it was taken by the stockholders of the Illinois corporation.

Fifteen years later, to wit, 1919 and 1920, the Electric Appliance Company of California, petitioner, asked for special assessment on the ground that this transaction back in 1905, whereby it succeeded to the business of a going concern without having to pay anything

for it, except to make payment for physical assets, created an abnormality in both its capital and income in 1919 and 1920, which would entitle petitioner to special assessment. This plea was denied on the authority of *Moses-Rosenthal Co.*, 17 B. T. A. 622, and *Coca-Cola Bottling Works of Pittsburgh*, 19 B. T. A. 267. Cf. *Washington Electric Supply Co.*, 9 B. T. A. 1399.

For the reasons stated, I do not believe that the situation in the instant case is one which calls for special assessment under sections 327 and 328 of the Revenue Act of 1921, and that special assessment should be denied.

SMITH agrees with this dissent.